CRAWFORDSVILLE TRUST COMPANY, EXECUTOR OF
ALFREY v. NICHOLS, ADMR.

## Opinion delivered January 3, 1916.

1. MASTER AND SERVANT—INJURY TO SERVANT—ASSUMED RISK.—Deceased, an employee of defendant, received an injury which resulted in his death, by falling into a hole filled with hot water. The hole had been formed by the bursting of a pipe. *Held*, under the evidence, that deceased, being familiar with the place and its condition, that he assumed the risk of injury from that cause, and that the defendant, not being negligent, there could be no recovery.

2. MASTER AND SERVANT—INJURY TO SERVANT—OBVIOUS DANGERS—ASSUMED RISK.—Where the elements of danger are obvious to a person of average intelligence, using due care, an employer is not required to warn his employee to avoid the danger, which ordinary prudence would make him avoid without warning.

Appeal from Craighead Circuit Court, Jonesboro District; *W. J. Driver,* Judge; reversed.

### STATEMENT BY THE COURT.

The appellee as administrator of the estate of Sandy Maggard, deceased, instituted this suit against H. Alfrey to recover for the benefit of the widow and minor children of Maggard for the loss of contributions and for pain and suffering endured by Maggard from the time he was injured until his death.

The complaint set forth that Maggard, at the time of his injury, was employed by Alfrey, who was the owner of a heading factory, engaged in the manufacture of headings, in the capacity of dust piler and his duty was to remove sawdust and other wooden particles that had been carried from the machines to the boiler room; that the boiler room was located near the northeast corner of the sawmill plant, and that from this boiler room ran pipes conveying hot water and steam to different parts of the plant; that for the purpose of heating the water the pump was placed in a pit on the west side of the boiler house for the purpose of circulating the hot water and steam through the pipes. On the west side of the boiler room, three or

four feet away from the wall and the pit where the pumps were placed there was a water hydrant, covered with part of a barrel. Between this hydrant and the pit mentioned was a passageway through which employees at the factory frequently passed in going to and from their work; that on the first of February it became necessary for Maggard, while engaged in the duties for which he was employed, to pass along on the west side of the boiler room between the boiler and the pit; that on the night before one of the large pipes, situated 18 or 20 inches in the ground, had burst and had washed away the ground, leaving in the passageway an excavation two or three feet deep, and that this hole had filled with boiling water from the boiler room; that from the pit in which the pumps were situated there issued at all times large quantities of steam which sometimes covered the passageway for several feet; that Maggard, on the morning he was injured, attempted to pass along the passage way in the performance of his duties and that the path at that time was covered with steam in such manner as to obscure the same and to prevent him from seeing the hole or pit, and that while in the exercise of due care he fell into the pit of scalding water, receiving injuries from which he died after having suffered great physical pain for a period of ten days; that Alfrey was negligent in that he had knowledge that the excavation had been made and that the same was filled with boiling water and had failed to place a barrier around the same for the protection of the employees whose duty it was to pass that way, and in that he failed to warn them of the danger.

Alfrey answered denying the allegations of the complaint as to negligence and setting up affirmatively the defenses of assumed risks and contributory negligence.

The manager of the plant testified that on the morning that Maggard was injured witness discovered the excavation into which Maggard fell just about the time the whistle blew at 7 o'clock for the men to go to work. The engineer had put two men to work in an effort to

drain the hole and five or ten minutes thereafter Maggard got hurt. The hole into which he fell was not there the day before.

The engineer, Holder, testified that the duty of Maggard was to wheel dust, clippings and wood in to the boiler room for the fireman. He described in detail the surroundings and the location of the pipes and the different parts of machinery and explained their uses. The plant did not operate at night. The fireman, at night, had two helpers. His duty was to look after the pumps, and the temperature, and watch around the mill and see that the men did their work. The place where Maggard was hurt was frequented by the employees, they passed over it time and again every day. It was necessary to go over that part of the ground in order to bring in fuel. Witness stated that he did not know what time Maggard went to work. He didn't know that Maggard knew that there was any hole there, but Maggard did know that there was water there. He could tell that, but a man that was not familiar with it could not tell how deep it was. He explained that when the steam was escaping from the exhaust pipe if the wind blew from the north it blew the steam towards the turning room; if from the northwest the steam went almost everyway. The wind was blowing from the north. If the wind was blowing from the north one going from the boiler room out towards the pump house could not see the ground as well because of the density of the steam. Witness had seen it so dense that one walking out that way could not see the ground at all. On the day that Maggard was injured it was a cold day, with the wind out of the north, and on such days there would be more steam than on clear days. Maggard was injured about 8 o'clock in the morning. He had been at work. Witness had seen the pit or hole in the ground before that time. He and another were digging a ditch at the time to drain it. At that time no guard rail had been put about the pit. The night foreman knew that the excavation had been made in the passage way because he spoke to wit-

ness about it about 7 o'clock that morning, and the manager also knew it. Witness had charge of the work of repairing the pipes around there. The fireman and Maggard were working in the boiler room and the witness and another party at the time were making repairs necessary to be made on account of the leaky condition of the pipe. The fireman and Maggard were subject to witness' orders; he had control over them. Witness' attention was called to the broken pipe by the night man between 6 and 7 o'clock. Witness had not called anybody's attention to it at the time he was notified because there was no one present at that time except the night man and the fireman. The fireman knew it. Witness did not remember that he had told Maggard about it; "the whole bunch of them was all looking at it; it was a very short distance from the boiler room door. Maggard was out there looking at it. He knew that the pump was in a defective condition."

Witness Stephens testified that he was in the employ of Alfrey as fireman at the time of Maggard's injury. He saw the hole where Maggard was scalded a little while before he was burned. He saw the fellows digging and went out to see what preparations they were making about draining the hole out. The hole was about 4 feet deep and about 3 feet wide. Witness covered it over with a plank after Maggard was burned. It was not but a little while before people would be passing carrying dinner. Witness had a little boy that brought his dinner and he thought that he might get into it and he therefore covered it over. While it was not a public passway, the employees would frequently go that way. When the wind was blowing from the north and the pumps were running, steam would cover the ground for a distance. Witness had seen the steam blow back so that he could not see right through it until he got close to it. If the wind was blowing from the north the steam would go towards the boiler house door, and a man going out of the boiler house door when the steam was escaping, and going in that direction could not see the ground

if the pumps were running. Witness did not know whether there was any steam from the exhaust pipe that day, but there was steam from the water in the hole. No one had told witness about the cave-in on the outside. Nothing was said about it in the boiler room where witness worked, and witness did not know about the hole being on the outside until Maggard got burnt. This witness stated that Maggard was burned somewhere near 11 o'clock. There was more steam out there on that occasion than usual; considerably more than the exhaust itself would make; they could not see where they were going on account of it. Maggard came in with a load of sawdust from the south side. He got hurt on the north side of the mill. He came in from the other side, set his wheelbarrow down and walked back out of the door through the north side of the plant and in about a minute or so witness was informed that he had been burned. There were signs out where Maggard got hurt forbidding employees to use this place. Witness did not know whether Maggard knew whether the signs were there or not, but he had been working there long enough to know. There was no guard or anything that would protect one from falling in the pit. It was drained soon after witness put the boards over it. The employees frequently slipped out that way and used the premises, notwithstanding the signs forbidding it. As witness understood it, it was against the rules to use the enclosure for purposes for which Maggard was using it.

Another witness testified that the employees had not been at work very long before Maggard was burned; that he was burned somewhere between 7 or 8 o'clock. Witness went to look at the hole where he was burned and he could not tell which way the steam was coming from. The whole thing was filled up with steam. Maggard was scalded in the regular passway. There was a pathway leading from the boiler room right over the pipes that were being fixed. When witness got out there there was so much smoke or steam that he could not see what was going on.

Witness Holder further testified that it was the duty of the night watchman to clean up, watch over the kilns and pumps, and to keep the temperature. He was supposed to go around the pumps every hour. The pumps were old and frequently the exhaust in them would blow out, and it had blown out of the south pump on that occasion. It could have been stopped in five minutes.

Alfrey, among others, asked the court to instruct the jury to return a verdict in his favor, and excepted to the ruling of the court in refusing to so instruct them. The jury returned a verdict in favor of appellee in the sum of $336 for the benefit of the estate and in the sum of $1,120 for the benefit of the widow and minor heirs.

Alfrey set up among other grounds in his motion for a new trial, that the verdict was contrary to the evidence, and that the court erred in refusing to instruct the jury to return a verdict in his favor. The court entered judgment in favor of appellee against Alfrey for the amount of the verdict, and this appeal has been duly prosecuted.

*E. L. Westbrook* and *T. D. Wynne,* for appellant.

The verdict is contrary to the law and the evidence; it was the duty of the court to direct a verdict for defendant for the reasons (1), that the undisputed proof on behalf of the plaintiff himself shows that the deceased assumed all risks resulting in the injury, and (2) that not only did he assume these risks, but that he was guilty of contributory negligence in voluntarily assuming such, and for no reason is appellant responsible under the law for the injury. 41 Ark. 542; Labatt on Master and Servant (1 ed.) par. 238; 82 Ark. 534; 163 Mass. 391; 90 Ark. 387; 119 Ark. 540; 98 S. W. (Mo.) 462.

*Baker & Sloan,* for appellee.

The argument of appellant is purely technical. Alfrey knew of the dangerous condition of the hole for hours beforehand, and yet had exercised *no* care to protect or safeguard those who might pass along the path-

way. The Goins case, 90 Ark. 387, is not similar nor parallel. In this case the condition causing the injury was a new one and Maggard did not know of the hole nor the danger. 98 Ark. 463 is wholly inapplicable. A case in point is 88 Ark. 204-208. Where there is a conflict of testimony, the jury must settle the matter and not the court. 101 Ark. 91-93; 104 Id. 162-174; 102 Id. 200-202. Juries must not indulge in presumptions or conjectures. This court, however, will indulge every reasonable presumption rather than disturb a verdict sustained by the evidence. Cases supra.

WOOD, J., (after stating the facts). (1) The court erred in refusing to grant appellant's prayer for a directed verdict in his favor. Under the undisputed evidence Maggard must be held to have assumed the risk, and the appellee, therefore, was not liable for the injury which resulted in Maggard's death. The testimony bearing upon the issues of negligence and assumed risk has been fully set forth in the statement, and, as we view it, there is no basis in the evidence for any other conclusion in the mind of any reasonable man than that the danger to which Maggard exposed himself was a perfectly obvious one. Maggard had been working for Alfrey at this plant long enough to be entirely familiar with the premises, and the undisputed evidence shows that all the employees, when their attention was first drawn to the conditions that existed at the place where Maggard was injured, could see that something was wrong with the machinery; that more steam was escaping from the pipes than usual; that the steam was so dense that it covered the passageway over which the employees walked and where the broken pipe the night before had caused the excavation into which Maggard fell and received his injuries. All reasonable minds must come to the conclusion that Maggard knew that there was a defective condition in the pipes or the pumps that caused the unusual quantity of steam which had obscured the passage way.

The jury had no right to disregard the undisputed evidence of Holder and the other witnesses to the effect

that the passage way on this occasion was hidden by the unusual quantity of steam which was escaping, and that mud and water was there, all revealing an unusual condition. There is no reason why Maggard if he had made proper use of his sense of sight, could not have discovered the same dangerous conditions that the other employees saw when they approached the place where the injury occured. The manager discovered the water there, the engineer discovered it, and the fireman discovered it; all knew that the conditions along this passage way were unusual. Holder stated that Maggard knew that there was water there; that he (Holder) and others were engaged at the time digging a ditch to drain the water off. He also stated that Maggard knew that the pump was in a defective condition. Witness Stephens saw the men digging and went out to see what preparations they were making about draining the hole out.

Without further discussing the evidence in detail it suffices to say, in the language of this court in *St. L., I. M. & S. Ry. Co.* v. *Goins,* 90 Ark. 387: "The testimony revealed a condition * * * that could not have escaped the notice of any man of ordinary experience and observation, whose senses were alert." *K. C. So. Ry. Co.* v. *Livesay,* 118 Ark. 304.

While there were some immaterial conflicts in the evidence on other points, there was no conflict as to the facts of the unusual and dangerous condition that existed on the morning when Maggard received his injuries, and that these conditions were so obvious that they could not escape the observation of any one who used his eyesight.

(2) We are also of the opinion that the court should have instructed the jury as matter of law that Alfrey was not negligent, under the circumstances, in failing to warn his employees of the danger and in failing to place a barrier around the excavation for their protection. The allegations of the complaint as to negligence were not proved. Alfrey, at the time of Maggard's injury, was doing all that any man of ordinary prudence would be required to do. The excavation was suddenly made dur-

ing the night by the bursting of a pipe, and it was discovered as soon as it could have been done in the exercise of ordinary care, and the employees had set about making the repairs, and were so engaged when Maggard came along and fell into the hole that the other employees were then draining.

The following language of the Supreme Court of Massachusetts is apposite to the state of facts shown by this record: "Where the elements of the danger are obvious to a person of average intelligence using due care, it would be unreasonable to require an employer to warn his employee to avoid dangers which ordinary prudence ought to make him avoid without warning. * * *. Something may properly be left to the instinct of self-preservation and to the exercise of the ordinary faculties which every man should use when his safety is known to be involved." *Daniel E. Stuart* v. *West End Street Ry. Co.,* 163 Mass. 391. See, also, *La. & Ark. Ry. Co.* v. *Miles,* 82 Ark. 534-538.

The judgment is therefore reversed and the cause is dismissed.