J. L. WILLIAMS & SONS, INC. *v.* TOMPKINS.

4-4981

Opinion delivered March 21, 1938.

*S. Hubert Mayes* and *Ned Stewart,* for appellant.
*John P. Vesey,* for appellee.

McHaney, J.   Appellee recovered a judgment for $6,000 against appellant for personal injuries he alleges he sustained on Sunday, April 19, 1936, while in its employ as day fireman in its lumber mill in the city of Hope.

At the conclusion of the evidence for appellee, which consisted of his own, as to how the accident occurred, and of a physician as to the nature and the extent of his injuries, appellant moved for a directed verdict, which was overruled; and again at the conclusion of all the evidence, the same motion was renewed with like result. This assignment of error is the ground upon which a reversal of the judgment against it is sought by appellant on this appeal.   We think it must be sustained.

Appellee testified that on the above mentioned date, he reported to appellant's mill at six o'clock for work. At that time, his foreman, Mr. Buck Williams, was present and directed him to perform certain duties as follows, to use his own language:

"Well, to put the water pressure on the boiler to see if the flues were leaking, do some repair work on the inside of the burner—brick work inside of the burner— and let the water out, and put oil in there and have it ready to go at six o'clock."   He further testified that by having it ready to go at six o'clock, meant six o'clock, p. m., and that he would have to start his fire in the boiler at about three-thirty, p. m.   He acted in pursuance of said directions and was through testing the flues at about nine

o'clock in the morning, and that he finished making repairs on the burner at about three o'clock in the afternoon. At that time, the water had been let out of the boiler and appellee went to secure some crude oil to put in the boiler before putting water in and starting the fire to get up steam. The reason for putting crude oil in the boiler was to prevent the water from foaming when it began to make steam. The crude oil was kept in fifty-five gallon steel barrels out near the edge of the lumberyard about sixty or sixty-five yards from the boiler room. Ordinarily, the oil barrel was kept upon a small platform about eighteen or twenty inches high, to facilitate drawing the oil out of the barrel at the bung in one end of the barrel. When he went to get the oil on this occasion, he found no barrel on the platform, but a full barrel in a little ditch near by. Upon discovering this situation, according to his own testimony, he proceeded as follows: "I rolled this here barrel out on a little level place there and fixed me a little platform, I think it was four by six or two by six on top, and was raising this barrel up, getting it on there so I could get my oil out; I was just ready to lay to it, lift over on the higher thing, when something popped in my back. And when it did I tried to straighten up and couldn't, and went to move and—went to walk over to the—some steps that run up into the mill and I fell—when I went to make a step I fell; I had to crawl over there. Then after about five minutes this leg (indicating left leg) was just plumb dead—just like sticking needles in it. And I crawled over to this place and set for about thirty minutes. After that time—after I got to where I could stand up, I went out and called this here darky to come and relieve me." He further testified in regard to the occurrence of lifting this barrel of oil and getting hurt, that there was no one present, not even the foreman, and no one was there to instruct him what to do and how to do it; that everybody had gone but him; that he was thoroughly familiar with the drums of oil as he had been getting oil from them for the same purpose for a period of three years prior to the accident, which was the length of time he had been working for the com-

pany; that the drums contained fifty or fifty-five gallons of oil. He further testified as follows:

"Q. Now, Mr. Tompkins, before you attempted to lift this barrel of oil did you try to get help to lift it? A. I did. Q. What did you do? A. I went out to the edge of the lumberyard and called Henry Garner and he was gone. Q. Is that the negro you later found at home? A. Yes, sir. He was gone. And I went back then to the boiler room to see if—There was an old negro that gets charcoal out of the slab pit, the fire there, and I thought maybe he might be out there getting in coal. I went back in there to see if I could call him, and he wasn't there—There wasn't anyone that I could call. Q. There was no one around there? A. No, sir. Q. On Sunday. And you went to this negro's house that you later found—this is, went out there toward it and hollered for him? A. I went to the edge of the lumberyard there. Q. And he wasn't there? A. No, sir, he wasn't there."

He further testified that it was a full barrel of oil and that he knew that a fifty-five gallon drum of oil was very heavy and that was the reason that he did not want to lift it by himself, and why he looked for help. He said he knew it was too heavy for any one man to lift if he could get out of it.

From the foregoing, it is difficult to perceive in just what manner appellant was negligent. The foreman for appellant had outlined the day's employment for appellee. Included in this was the putting of crude oil in the boiler. There is nothing in the evidence that shows that the foreman or any other person connected with the appellant knew that the oil barrel was empty, and that a new barrel had to be put on the rack. It is not a case of an emergency whereby appellee had to take the risk in order to accomplish his work, as he had about three hours left in which to get steam in the boiler and have it ready to go by six o'clock. It is not a case where the master was present and directing the servant to do a particular thing or that the servant was acting under the immediate direction of his foreman. There is nothing in the evi-

dence to show that the foreman had been present since early in the morning when the directions were given. So, the evidence wholly fails to disclose wherein the master was guilty of any negligent act. But, if it could be said that the master was negligent in some respect in connection with the placing of the barrel of oil on the platform, still appellee could not recover because under all the facts and circumstances in the case, he clearly assumed the risk. He knew the barrel of oil was very heavy, weighing from 400 to 500 pounds, although he did not know its exact weight, and he knew that it was too heavy for him to handle alone. He knew his own strength better than any one else did, and in this respect, we think the recent case of *Kurn* v. *Faubus*, 191 Ark. 232, 84 S. W. 2d 602, is controlling.

It was there said: "The law is that where the perils of the employment are known to the master but unknown to the employee, the master has the duty of apprising the employee thereof, and a neglect by the master of such duty creates actionable negligence; but where the employee's knowledge of the perils of the employment equals or surpasses that of the master, then there is no duty upon the master to apprise the employee of something already well known to him." Citing *McEachin* v. *Yarborough*, 189 Ark. 434, 74 S. W. 2d 228. Again it was said in the same case: "The undisputed testimony adduced in the instant case is to the effect that appellee knew his physical condition equally as well as did Garrison, even after Garrison had been apprised thereof, and appellee was the sole factor in applying his strength in the removal of the heavy box of bearings whereby he received his injury. If this were negligence, it is exclusively that of appellee's and appellants are not responsible for the resultant injury." Citing *M. P. Rd. Co.* v. *Martin*, 186 Ark. 1101, 57 S. W. 2d 1047; *Crawfordsville Trust Co.* v. *Nichols*, 121 Ark. 556, 181 S. W. 904.

In the recent case of *National Refining Co.* v. *Wreyford*, 189 Ark. 598, 74 S. W. 2d 633, it was held that an employee who was injured in moving an oil barrel

under telephonic instructions from his superior, could not recover because the evidence was insufficient to establish negligence on the part of the employer and that such an employee should be held to have assumed the risk under the circumstances stated. The rule was reaffirmed there, to quote a headnote: "The rule that an employee might rely upon an implied assurance of safety in performing an act commanded by his superior applies only where the superior is present or has knowledge of the situation and circumstances equal to that of the employee."

Appellee cites and relies upon the case of *Owosso Manufacturing Co.* v. *Drennan,* 182 Ark. 389, 31 S. W. 2d 762, and other cases to the same effect, but in that case, the servant was acting under the direct command of his superior which distinguishes it from the case at bar. Here, not only was the foreman absent, but it is not even shown that the foreman or any other person connected with appellant knew that all of the oil had been drawn from the barrel and that a full barrel would have to be placed upon the platform before withdrawing the oil therefrom.

We are of the opinion that the court erred in refusing to direct a verdict in appellant's favor. The judgment will, therefore, be reversed, and as the cause appears to have been fully developed, it will be dismissed. It is so ordered.