THE KANSAS CITY SOUTHERN RAILWAY COMPANY
*v.* HOLDER.

4-5448      127 S. W. 2d 807.

Opinion delivered April 24, 1939.

*Joseph R. Brown* and *James B. McDonough,* for appellant.

*Lake & Lake* and *Shaver, Shaver & Williams,* for appellee.

HOLT, J. Appellee recovered a judgment against appellant in the Little River circuit court for damages alleged to have been sustained by him while assisting in the unloading of a switch tie from a gondola freight car at Neal Springs, Arkansas, at about 2:30 p.m. on June 9, 1937.

In his complaint appellee (plaintiff below) charged that he was injured when he, with two members of a sec-

tion crew, lifted one end of a switch tie over the side of a coal car and alleged negligence on the part of appellant (defendant below) as follows: "In the removal of said timber the foreman directed the plaintiff and the other two members of said crew to raise one end of said timber to the top of the side of said gondola car, which they did, and the said foreman placed and held an iron bar between the end of said timber and the side of said car to prevent it from falling back into the car, then directed the plaintiff and the other two members of said crew to lift the other end of the timber and place same on top of the car for the purpose of rolling it from said car onto the ground. In obedience to said order, the plaintiff and the other two members of said crew attempted to lift said timber as directed, the plaintiff being at the end thereof, and because of the excessive weight of the timber and the pressure of the same against the side of the car by holding the iron bar between the side of the car and the other end of the timber, the plaintiff and his co-workers were required to and did exert extraordinary and unusual strength and force in lifting said timber and as a result thereof he received the injuries." He further alleged that his injury was due to appellant's negligence in failing to furnish more men to unload the switch ties.

Appellant demurred to appellee's complaint on the ground that it did not state facts sufficient to constitute a cause of action. The court overruled this demurrer.

Appellant answered denying every material allegation in the complaint and affirmatively pleaded contributory negligence and assumption of risk on the part of appellee, and, in addition, a complete release executed by appellee for a consideration of $350 paid to him by appellant. Trial to a jury resulted in a verdict in favor of appellee in the sum of $2,650, which represented the amount sued for, less the amount of the release settlement. From a judgment thereon comes this appeal.

The evidence, as presented by this record, stated in its most favorable light to appellee, is substantially as follows: Appellee testified that he was ordered to lift

with Tollett and Ponder, the two other section crew members, the north end of the switch tie in question to the top of the coal car, which was about four feet high; that foreman, Todd, held the north end of the tie by inserting a lining bar thereunder; that he, with the other two section men lifted the south end of the tie to the top of the car and pushed it over, and that when they had the south end of the tie about knee high he, appellee, "received a pulling over my hips in the small of my back with pain and it grew worse."

The record further reflects that appellee did not tell foreman, Todd, he was hurt and continued working the rest of that day, but next morning appellee's wife telephoned Todd that appellee had a catch in his hip. Appellee, Ponder and Tollett, complained about the ties being heavy, but not to the foreman. Appellee admitted he knew the bar was under the north end of the tie when he, with the other two men, lifted the south end, and that he knew how heavy the tie was.

Appellee's witness, G. W. Strickland, testified the timber appellee said he overexerted himself lifting, weighed 1,098 pounds. Witness had had many years' experience in trucking timbers, and had previously worked two days unloading ties for the Rock Island Railroad and one-half day for the Kansas City Southern. Pine timber weighed 4.3 pounds to the board foot and oak 9 pounds. Witness used the latter weight in computing the weight of the timber appellee said he overexerted himself lifting.

Division engineer, P. G. McCarthy, testified that an oak board foot weighed 4½ pounds and pine from 4 to 4.3 pounds.

Appellant's witnesses, Ponder and Tollett, the two members of the section crew who assisted appellee in lifting the tie at the time he claimed to be hurt, testified that they did not overexert themselves at the time they lifted the tie in question; that they frequently lifted rails and the motor car, which were heavier than switch ties; that the switch ties were unloaded June 9 in the usual and customary way. They denied that they complained

of the switch ties being heavy, and Tollett testified the heaviest tie unloaded on June 9, 1937, the day of the alleged injury, weighed from 300 to 400 pounds, and that the tie in question weighed 375 pounds.

Witness Waldrop, who had worked as section foreman for appellant for twenty years, testified that the switch tie in question weighed about 380 pounds. Both Todd and Waldrop testified the section crew lifted the motor car on and off the track several times each day, and it weighed 1,100 to 1,200 pounds, and that the tie in question was unloaded in the usual and customary way.

Appellant's witness, R. M. Blades, road master for twelve years, testified that the tie in question weighed 380 pounds, and that it was unloaded in the usual and customary way. P. G. McCarthy, appellant's division engineer, corroborated Blades' testimony.

Appellant's foregoing witnesses also testified that switch ties were not shipped on flat cars, because it was difficult to keep them in place, and it was customary to ship creosoted switch ties in coal cars, and that a section crew was composed of three men and the foreman.

On this state of the record appellant earnestly contends that the evidence is not of that substantial character sufficient to support a verdict for appellee, and that the trial court erred at the close of the testimony in refusing to instruct a verdict for appellant. We think that appellant is correct in this contention.

At the time of the alleged injury, the record discloses that appellee, assisted by two helpers, was attempting to lift one end of a switch tie while the other end was being held by a foreman of the crew, up over the side of a gondola freight car, a distance of about four feet. This was a very simple operation. Appellee's knowledge of the circumstances, as disclosed by the evidence, equalled that of foreman, Todd. He needed no instructions in the lifting process, and none were given. No one knew better than appellee himself the extent of his own strength or his capacity to lift. We think appellee assumed whatever risk attended the lifting of the

tie in question, and that no negligence chargeable to appellant appears in this record.

In *Luten Bridge Co.* v. *Cook*, 182 Ark. 578, 32 S. W. 2d 438, the court said: "No one could know better than he (plaintiff) what force might safely be applied, and the danger of injuring himself if he overtaxed his strength was an obvious one, the risk of which he must be held to have assumed." And again in *Louisville & N. R. Co.* v. *Sawyers*, 169 Ky. 671, 184 S. W. 1123, the court said: "The only safe and practical rule is that each man is the best judge of his own physical strength and powers of endurance; that he knows better than any other can when the limit has been reached, and when, in following his own instinct of self-preservation, he must desist and exercise his right under the law to give up his work, if it is more than he can stand."

This court in the recent case of *Kurn* v. *Faubus*, 191 Ark. 232, 84 S. W. 2d 602, in reversing a judgment for the plaintiff said: " . . . Appellee knew his physical condition equally as well as did Garrison, even after Garrison had been apprised thereof, and appellee was the sole factor in applying his strength in the removal of the heavy box of bearings whereby he received his injury. If this were negligence, it is exclusively that of appellee, and appellants are not responsible for the resultant injury."

In 39 C. J. 801, § 1007, the text-writer announces the rule as follows: "Where the servant has equal or better means of knowledge than the master of the danger of obeying the master's orders, he assumes the risk of so doing."

In *St. L.-S. F. Ry. Co.* v. *Childers*, 197 Ark. 527, 124 S. W. 2d 964, the plaintiff, an experienced man, claimed to have been injured in removing a hand-car from the track with the crew in charge of a foreman, when the car was placed on the embankment with plaintiff at the lower end, and he tried to stop the car as it rolled down the embankment. This court held that there was no actionable negligence, and that a verdict should have been directed for the defendant, and said: "He (plaintiff)

knew better than anyone else whether his strength would enable him to prevent the car rolling, and we, therefore, conclude that any injury which he may have sustained, whatever its extent may be, was the result of a risk which he had assumed as an incident to his employment.''

In *Choctaw, O. & G. R. Co.* v. *McDade*, 191 U. S. 64, 24 S. Ct. 24, 48 L. Ed. 96, the court held: He (employee) assumes risks not ordinarily incident to his employment, provided he knows of them and appreciates the danger, or provided they are so plainly observable that he must be presumed to know them and to appreciate the danger.

In *Crawfordsville Trust Co.* v. *Nichols*, 121 Ark. 556, 181 S. W. 904, this court said: ''Where the elements of danger are obvious to a person of average intelligence, using due care, an employer is not required to warn his employee to avoid the danger, which ordinary prudence would make him avoid without warning . . . Something may properly be left to the instinct of self-preservation and to the exercise of the ordinary faculties which every man should use when his safety is known to be involved.''

We conclude, therefore, that the trial court erred, at the close of all the testimony, in refusing to instruct the jury as a matter of law, that the evidence was not sufficient to support a verdict for appellee against appellant, and since the cause seems to have been fully developed, it is reversed and dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.

HUMPHREYS, J. (dissenting). I cannot agree with the majority of the judges in their view that when the evidence in this case is viewed in its most favorable light to appellee no liability has been shown on the part of appellant. The evidence is in sharp conflict as to all the material issues in the case and the question of fact was submitted to the jury by the court under correct instructions. The majority of the court have clearly invaded the exclusive province of the jury and determined the question of fact as to liability themselves. There is nothing in the record that shows that the verdict was the result of passion or prejudice and where the evidence

is conflicting the question of fact as to liability was one for the jury and not for the court. My high regard for the position of a jury in our system of jurisprudence and the solemnity of a jury verdict is such that I am not willing to follow the majority into the field of the determination of questions of fact. To do this, in my humble judgment, will tend in the end to destroy the jury system or else result in a constitutional amendment preventing judges from interfering with jury verdicts at all. My high regard for the jury system and the solemnity of jury verdicts and the duties devolving upon jurors cannot be better expressed than the recent charge of Judge Gordon W. Chambers, Judge of the city court of Richmond county, Ga., to a jury which had been summoned to determine issues of fact in cases which they were to try. The charge he made them is as follows: ''Gentlemen of the Jury, by being selected for jury service you have been elevated to the peerage of democracy. As such you have a noble opportunity for service, obligated by patriotic duty to God and country. This duty is deserving of the consecrated dedication of a conscientious concentration of your abilities and the just impulses of your honor.

''You are a shield of protection against false accusers, transitory passions and prejudice.

''You are determiners of truth revealing the character of our country as a land of the free and home of the brave.

''You are the preservers of liberty that walks with progress and restrains only libertine license to insure its own freedom.

''You are the protectors of all legal rights of society, citizenship and the state.

''You are guarantors of justice, constitutional and statutory, exactly, evenly and universally applied.

''You are the custodians of American civilization, for without law there can be no civilization, without courts there can be no law and without truth and independence there can be no courts.

''The only title of nobility recognized by America's loyal house is in the peerage of the jury box where trial

by peers determine the truth of issues between the state and its citizens.

"This title carries no feudal privilege or materialistic value, however, it merits the accolade of achievement —the accomplishment of the aristocracy of service.

"This high honor carries only the title as a word of address or as an adjective of description, 'Gentlemen of the Jury'."

The sentiment contained in this charge should sink into the hearts and minds of every judge in the United States so that they might have the proper regard for the solemnity of jury verdicts.

Judge Mehaffy requests that I note him as joining in this dissenting opinion, which I take pleasure in doing.